681 A.2d 724

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Angel Luis REYES, Appellant.**

Supreme Court of Pennsylvania.

Argued Oct. 25, 1995.

Decided July 31, 1996.

Reargument Denied Nov. 12, 1996.

376

Patrick J. Connors, Media, William E. Ruane, Lansdowne, for Appellant.

William H. Ryan, Jr., Drexel Hill, William R. Toal, III, Media, Robert A. Graci, Attorney General's Office, Harrisburg, for Appellee.

Before NIX, C.J., and FLAHERTY, ZAPPALA, CAPPY, CASTILLE and MONTEMURO, JJ.

## OPINION

NIX, Chief Justice.

Appellant, Angel Luis Reyes, was found guilty of first degree murder,[1] aggravated assault[2] and endangering the welfare of children[3] following a non-jury trial conducted by the Honorable Frank T. Hazel. After Judge Hazel found Appellant guilty, a jury was empaneled for the purpose of determining Appellant's penalty. Following a three day penalty phase procedure, the jury returned a sentence of death for the first degree murder conviction. Based upon the imposition of a sentence of death, we have jurisdiction to

1. 18 Pa.C.S. § 2502(a).
2. 18 Pa.C.S. § 2702(a)(1).
3. 18 Pa.C.S. § 4304.

review this direct appeal of Appellant's conviction and sentence pursuant to 42 Pa.C.S. § 9711(h)(1).[4]

Although Appellant has not specifically challenged the sufficiency of the evidence, we begin, as we do in all death penalty cases, by performing our self-imposed obligation to independently review the evidence underlying the first degree murder conviction. *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 26–27 n. 3, 454 A.2d 937, 942 n. 3 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983). The standard upon which we review the sufficiency of the evidence is whether the evidence, and all reasonable inferences derived therefrom, when viewed in the light most favorable to the Commonwealth as verdict winner, supports the jury's finding of guilt beyond a reasonable doubt. *Commonwealth v. Rhodes*, 510 Pa. 537, 539–40, 510 A.2d 1217, 1218 (1986).

Appellant and Julia Martinez lived together and were the natural parents of the decedent, Marcia Reyes. Julia had older sons by a previous relationship. One of those sons, Louis, and Appellant hated each other. Louis, who moved out of the house at the age of fourteen to live with other relatives, estimated that over the course of seven years, he saw his mother on only three occasions, and rarely spoke with her by telephone. On those occasions when Louis contacted his mother, Appellant and Julia would argue. Julia was afraid to meet with or talk to Louis in her home because Appellant had told her that any place he found Louis he was going to get him.

Appellant frequently threatened Julia that if she tried to leave, she would not take Marcia with her. On one occasion prior to Marcia's death, Appellant had an altercation with one of Julia's other sons, Javier. Following the fight, Javier called the police, and Appellant left the house with Marcia. When Julia could not find them, she filed a missing person report with the police. After driving around searching for Appellant

4. 42 Pa.C.S. § 9711(h)(1) provides that "[a] sentence of death shall be subject to automatic review by the Supreme Court of Pennsylvania pursuant to its rules."

and Marcia, Julia eventually discovered them on the street. Appellant positioned himself between Julia and Marcia and specifically threatened that if she ever called the police on him again and he was arrested, she would find Marcia in the river with her throat slashed.

On May 25, 1993, Louis, now twenty-one years old, returned unannounced to visit his mother. When he discovered that his mother was not home, Louis went to a friend's house nearby. Louis then proceeded to wash his car on the street, and Appellant walked by. Louis testified that Appellant looked directly at him as Appellant walked towards his residence. Louis continued to visit with friends and relatives while he awaited his mother's arrival. Eventually, Julia came out of the house, and the two of them arranged to meet at a relative's home, thereby avoiding Appellant. Louis, Julia, and Marcia visited for approximately one half-hour. This marked the first time that Louis had seen Marcia since she was an infant. After the visit, they left the house separately.

Julia and Marcia returned home, and Marcia went to the backyard to play. Julia saw Appellant enter the yard through the back gate. Appellant approached Julia and put his arms around her. At that point, Marcia told Appellant not to hug or kiss her because someone had already done that. Believing that he might have already seen Louis, Appellant asked Julia if in fact Louis was in town. Julia responded in the affirmative. Appellant then entered the house, retrieved his car keys, and came out carrying a long pole. He then took Marcia by the hand, led her out the backyard gate, got into Julia's car and drove off. That was the last time Julia observed Marcia alive.

Elsa Martinez, Julia's sister, saw Appellant and Marcia in Julia's station wagon shortly before six p.m. on May 25, 1993. A neighbor of Appellant and Julia, Evelyn Garcia, also saw Appellant in the late afternoon on May 25, 1993. Ms. Garcia testified that she observed Appellant open the gate to his yard, take Marcia by the hand, cross the field behind the house, and drive off with Marcia in Julia's station wagon. About fifteen to twenty minutes later, she witnessed Appellant

return. She observed Julia go to the car, but Marcia was not in it. She then observed a conversation between Julia and Appellant, after which Appellant left his car running in the middle of the street and entered his house. Julia then entered Ms. Garcia's home for the purpose of dialing 911.

Appellant left his house on foot and subsequently presented himself at the Chester Police Station. At approximately 6:30 p.m. on May 25, 1993, Appellant approached Sgt. Lawrence Platt and stated "You want me, I killed my daughter." (N.T. 11/17/93, 92). Sgt. Platt asked Appellant to explain how it had happened, but Appellant refused. Sgt. Platt advised Appellant that he could not arrest him without further information, to which Appellant responded, "Yes, you have to arrest me." (N.T. 11/17/93, 93). Sgt. Platt invited Appellant into the Shift Commander's Office and again asked what had happened. Appellant responded, "I'll tell you tomorrow," but refused to give any further information. (N.T. 11/17/93, 94). Sgt. Platt asked Appellant why he was making him wait until tomorrow. Appellant responded, "I'm going to make them suffer, I'm going to put pressure on them like they put pressure on me." (N.T. 11/17/93, 95). Later Appellant told Sgt. Platt that he put Marcia in the water. When questioned, he reiterated, "I'll tell you tomorrow." (N.T. 11/17/93, 98). When pressed further as to where he put her, Appellant responded "Eddystone." (N.T. 11/17/93, 99). At that point, Del Comm was contacted in order that a search boat be dispatched to locate Marcia; however, nothing was found that night. The next day, Marcia's body was discovered in the Delaware River, near its juncture with Ridley Creek, in an isolated area consisting of industrial and private property. Her body was found about 1,000 feet from the Fourth Street Bridge, which is closed to traffic by a barrier. Based on the testimony of Elsa Martinez and Sgt. Platt, and exhibits depicting the area, the trial court took judicial notice that the location where Marcia was found was approximately four miles from Marcia's home.

The Coroner, Dimitri Contostavlos, testified that Marcia had died by drowning and that there was a bruise on her leg which could be consistent with an adult hand holding the leg.

He classified the death as homicide based on the information that was provided to him by the police regarding how Marcia entered the water.

■ Evidence is sufficient to sustain a conviction for first degree murder when the Commonwealth establishes that the defendant acted with specific intent to kill; that a human being was unlawfully killed; that the person accused did the killing; and that the killing was done with deliberation. *Commonwealth v. Mitchell*, 528 Pa. 546, 551, 599 A.2d 624, 626 (1991). Based upon the foregoing facts, it is evident that sufficient evidence was presented to support the first degree murder conviction. We therefore proceed to address Appellant's allegations of error relating to his trial.

Appellant's first claim of error concerns the issue of corpus delicti. Appellant argues that the trial court erred when it utilized an erroneous standard in determining whether the corpus delicti had been established. Appellant contends that had the trial court employed the proper standard, the court would have had to conclude that the Commonwealth failed to establish the corpus delicti, and as such, Appellant's inculpatory statements would have been inadmissible.

■ Before introducing an extra-judicial admission, the Commonwealth must establish by independent evidence that a crime has in fact been committed; however, the Commonwealth is not required to prove the existence of a crime beyond a reasonable doubt. *Commonwealth v. Byrd*, 490 Pa. 544, 556, 417 A.2d 173, 179 (1980); *Commonwealth v. Ware*, 459 Pa. 334, 329 A.2d 258 (1974). The purpose of the corpus delicti rule is to guard against "the hasty and unguarded character which is often attached to confessions and admissions and the consequent danger of a conviction where no crime has in fact been committed." *Commonwealth v. Turza*, 340 Pa. 128, 134, 16 A.2d 401, 404 (1940). The corpus delicti, like other facts, may be shown by circumstantial evidence; it is sufficient if these circumstances are consistent with a crime even though they are also consistent with a suicide or an accident. *Commonwealth v. Boykin*, 450 Pa. 25, 29, 298 A.2d

258, 261 (1972). However, it is insufficient if it is merely as consistent with an accident as with a crime. *Commonwealth v. Byrd,* 490 Pa. 544, 556, 417 A.2d 173, 179 (1980).

Neither Appellant nor the Commonwealth challenges that the aforementioned rules, pertaining to the *admissibility* of extra-judicial statements, represent the current state of the law in this Commonwealth. Instead, their disagreement is focused on the quantum of proof that the Commonwealth is required to put forth before the factfinder is permitted to *consider* extra-judicial statements in assessing a criminal defendant's guilt or innocence. Appellant argues that before a factfinder may consider extra-judicial statements, the factfinder must be convinced beyond a reasonable doubt that the corpus delicti has been established. In support of his position, Appellant cites to a line of cases from both this Court and the Superior Court. *E.g., Commonwealth v. Frazier,* 411 Pa. 195, 191 A.2d 369 (1963); *Commonwealth v. Lettrich,* 346 Pa. 497, 31 A.2d 155 (1943); *Gray v. Commonwealth,* 101 Pa. 380, 386 (1882); *Commonwealth v. Fried,* 327 Pa.Super. 234, 475 A.2d 773 (1984) (Per McEwen, J., with two judges concurring in result).

The Commonwealth concedes that there is a line of cases which so hold. Nevertheless, it argues that this Court has not consistently applied the requirements first announced in *Gray v. Commonwealth,* 101 Pa. 380 (1882), and has not drawn a clear distinction between the burden of proof required for the admissibility of an extra-judicial statement versus the burden of proof required before a factfinder may consider an extra-judicial statement in assessing a criminal defendant's guilt or innocence. Thus, according to the Commonwealth, this Court has already abandoned the dual level of proof and replaced it with one that simply focuses upon the admissibility of the statement once the corpus delicti has been proven by a preponderance of the evidence. To alleviate the confusion surrounding this issue, the Commonwealth requests that this Court formally eliminate the second level of proof, and explicitly declare that extra-judicial statements are both admissible and can be considered by a factfinder once the Commonwealth

has established by a preponderance of the evidence that a crime occurred under circumstances more consistent with criminality than with suicide or natural or accidental causes.

The Commonwealth's assertion that the two-tiered approach has been abandoned is belied by the fact that as recently as last year, the Superior Court in *Commonwealth v. Ahlborn,* 441 Pa.Super. 296, 657 A.2d 518, *appeal pending,* 334 W.D. Allocatur Docket (1995), reiterated that the application of the corpus delicti rule occurs in two distinct phases.

> After the court has made its initial determination that the Commonwealth has proved the corpus delicti by a preponderance of the evidence and has ruled the confession to be admissible, the corpus delicti rule *additionally* requires that the Commonwealth prove to the *jury's satisfaction beyond a reasonable doubt,* the corpus delicti of the crimes charged.

*Id.* at 301–02, 657 A.2d at 521.

Moreover, we decline to accept the premise of the Commonwealth's argument, namely that over the years this Court and the lower courts have not applied the requirements announced in *Gray v. Commonwealth,* 101 Pa. 380 (1882), in a consistent fashion and, as such, have treated the corpus delicti rule as one of admissibility. In support of this position, the Commonwealth submits to this Court a line of cases in which the courts have purportedly failed to draw the requisite distinction between the quantum of proof required to admit an extra-judicial statement and the quantum of proof required for the factfinder to consider the statement. *E.g., Commonwealth v. Edwards,* 521 Pa. 134, 555 A.2d 818 (1989); *Commonwealth v. Byrd,* 490 Pa. 544, 417 A.2d 173 (1980); *Commonwealth v. Ware,* 459 Pa. 334, 329 A.2d 258 (1974).

We are not persuaded by this reasoning, nor are we surprised to see the absence of such discussion in the cases cited by the Commonwealth. Challenges to the corpus delicti issue frequently fall into two distinct groups. The first group consists of claims that the trial judge erred in admitting an extra-judicial statement because the Commonwealth failed to establish the corpus delicti by a preponderance of the evi-

dence. Because the challenge in these types of cases is directed solely at the admissibility of the confession, one would not ordinarily expect an appellate court to entertain a discussion of the rule as it relates to the jury's consideration of the statements. However, the line of cases cited by the Commonwealth as persuasive authority for the proposition that this Court has abandoned the two-tiered approach deal exclusively with challenges to the *admissibility* of the extra-judicial statement. *E.g., Commonwealth v. Edwards,* 521 Pa. 134, 555 A.2d 818 (1989) (the appellant argued that his extra-judicial statements were inadmissible); *Commonwealth v. Byrd,* 490 Pa. 544, 417 A.2d 173 (1980) (the appellant argued that the trial court erred in admitting his inculpatory statement prior to the establishment of the corpus delicti); *Commonwealth v. Ware,* 459 Pa. 334, 329 A.2d 258 (1974) (the appellant argued the trial court erred in permitting the jury to consider his extra-judicial statement because the Commonwealth failed to establish the corpus delicti).

In contrast, the second group of cases focuses on a challenge to the trial judge's charge to the jury. It is this type of challenge where one ordinarily sees a discussion of the second level of proof as it relates to the quantum of evidence necessary before a factfinder may consider a defendant's extra-judicial statements. *E.g., Commonwealth v. Tallon,* 478 Pa. 468, 387 A.2d 77 (1978) (the appellant argued that the court erred in charging the jury on what evidence could be considered in determining the corpus delicti of the crimes charged); *Commonwealth v. Ahlborn,* 441 Pa.Super. 296, 657 A.2d 518, *appeal pending,* 334 W.D. Allocatur Docket (1995) (the appellant argued that the trial court erred in failing to instruct the jury that it could not consider the appellant's extra-judicial statements or admissions until the corpus delicti of the crimes charged were proven beyond a reasonable doubt); *Commonwealth v. Fried,* 327 Pa.Super. 234, 475 A.2d 773 (1984) (the court awarded defendant a new trial because trial judge failed to instruct the members of the jury that they must first be convinced beyond a reasonable doubt of the existence of the corpus delicti before they may consider an extra-judicial state-

ment by the accused as evidence of guilt). Thus, we find that the two-tiered approach is still followed in this Commonwealth, and we reject the Commonwealth's contention to the contrary.

Appellant argues that the trial court failed to follow the two-tiered approach before considering Appellant's extra-judicial statements. In support of Appellant's position, he cites to the following colloquy, which occurred between the trial court and his counsel and which Appellant believes demonstrates that the trial court was confused regarding these two standards.

MR. FINNEGAN (Defense Counsel): Yes, but I believe the case law states that before you can consider the statements, you have to be satisfied beyond a reasonable doubt that the Commonwealth has proven corpus [delicti] before they can admit the statements.

THE COURT: Well, we've already been there. I don't have to be satisfied beyond a reasonable doubt about anything with respect to corpus [delicti] in order to admit the statements. I've got to be satisfied that the evidence is more consistent with a homicide than it is anything else in this matter, and that allows the statements to come in, and then to determine whether the elements of the crime, namely that the Defendant killed the victim, I now may consider the complete continuum of evidence presented on that issue, which includes the statements.

MR. FINNEGAN: Yes, but you may still find the corpus [delicti] flawed, Your Honor, because . . .

THE COURT: I may. Yes, I'm not saying that it's a dead-set certain conclusions [sic]. I'm simply saying what I now may consider in determining the second element of the crime, namely that the victim is dead, I now may consider statements of the Defendant where I couldn't consider them in making the determination for corpus [delicti].

(N.T. 11/18/93, 24–25).

After reviewing this colloquy, there appears to be some confusion in the quoted passage. First, we note that the initial confusion seems to be the result of the trial court's

response to an incorrect assertion of law by Appellant's trial counsel, Mr. Finnegan. Mr. Finnegan told the trial court that it must "be satisfied beyond a reasonable doubt that the Commonwealth has proven the corpus [delicti] before they can admit the statements." (N.T. 11/18/93, 24). As we have already stated, and as the trial court correctly responded to Mr. Finnegan, the court needs only to be satisfied that the evidence is more consistent with a crime than an accident or suicide to admit the statements. The court did, however, go on to state that once that evidence was admitted, "to determine whether the elements of the crime, namely that the Defendant killed the victim, [the court] may now consider the complete continuum of evidence presented on that issue, which includes the statements." (N.T. 11/18/93, 24). Moreover, the court later stated that "in determining the second element of the crime, namely that the victim is dead, [the court] now may consider statements of the Defendant where [it] couldn't consider them in making the determination for corpus [delicti]." (N.T. 11/18/93, 25).

The trial court's failure to follow the two-tiered approach is further evidenced in its Opinion where the court stated:

Defendant's second alleged error is that we considered evidence of his inculpatory statements, despite the fact that the Commonwealth had not proved beyond a reasonable doubt the existence of the corpus delicti. The third is that we utilized an improper standard in reviewing the evidence, leading to an erroneous conclusion that the corpus delicti had been established. Again, as set forth in [*Commonwealth v. Kasunic*, 423 Pa.Super. 112, 620 A.2d 525 (1993),] the evidence need only to suggest a greater likelihood of criminality, as opposed to proving it beyond a reasonable doubt.

*Commonwealth v. Reyes*, No. 1388–93, slip op. at 9 (C.P Delaware County Dec. 7, 1994).

As such, we agree with Appellant that although the trial court employed the proper standard for admitting his extra-judicial statements, the trial court failed to utilize the correct standard regarding its consideration of the statement. How-

ever, even excluding the alleged erroneously admitted inculpatory statements of Appellant, and the Coroner's report as well, the circumstantial evidence alone was sufficient to convict Appellant of murder.

■ Where a trial court sitting without a jury states that evidence independent of a defendant's inadmissible statements satisfied it that the defendant's guilt was established beyond a reasonable doubt, a defendant is not entitled to a new trial. *See Commonwealth v. Oliver*, 273 Pa.Super. 140, 416 A.2d 1128 (1979). In reviewing the trial judge's finding that, even excluding Appellant's extra-judicial statements, the evidence established Appellant's guilt beyond a reasonable doubt, we must determine whether viewing all of the evidence, in the light most favorable to the Commonwealth as verdict winner, supports the factfinder's finding. *See Commonwealth v. Rhodes*, 510 Pa. 537, 539–40, 510 A.2d 1217, 1218 (1986).

■ In the case *sub judice*, the facts and reasonable inferences uncover a history of threats directed at Julia Martinez, the victim's mother. Appellant's conduct toward Marcia, their child and victim in this case, was used as à method of controlling Julia's activities. Appellant loathed Julia's son, Louis, and he used his own child as a pawn to punish Julia for maintaining contact with Louis. Appellant's suspicions that Louis was back in town were confirmed by Marcia's innocent comment that someone else had hugged and kissed her mother. Marcia, was last seen alive with Appellant, who immediately after hearing her remark, calmly and deliberately took her away in a car. Appellant was seen driving in the direction of Ridley Creek, where Marcia's body was eventually discovered. Her body was discovered in an isolated and barricaded industrial area four miles from her home. When Appellant returned home thirty minutes later, he did so without Marcia. Upon arriving home, Appellant immediately went to the police station. Appellant, the father of the victim, failed to take any actions consistent with a parent whose child had been accidently injured or lost. Finally, there was a bruise on Marcia's leg consistent with an adult hand clutching her there.

Again, the trial court, acting as the factfinder in this case, concluded that even excluding Appellant's inculpatory statements and the Coroner's report, the court was satisfied that the evidence was sufficient to establish beyond a reasonable doubt both the corpus delicti and Appellant's guilt. *Commonwealth v. Reyes*, No. 1388–93, slip op. at 13 (C.P Delaware County Dec. 7, 1994). Based upon the aforementioned facts, we are satisfied that there was sufficient evidence to support the trial court's conclusion that the Commonwealth proved Appellant's guilt beyond a reasonable doubt even excluding Appellant's extra-judicial statements.

Appellant's second claim of error concerns his right to allocution. Appellant contends that he was denied the opportunity to make a plea for his life, in the nature of an allocution. During the penalty phase of the trial, Appellant had filed a motion *in limine* in which he sought to address the jury without being subject to cross-examination by the Commonwealth. The trial judge denied the motion, and Appellant elected not to testify. Appellant asserts that the trial court's denial violated his Sixth Amendment right to prepare a defense, Eighth Amendment protections against cruel and unusual punishment, and his due process and equal protection rights. Appellant implicates both the Pennsylvania and United States Constitutions in these assertions.

Appellant acknowledges the fact that this Court has recently addressed this issue in *Commonwealth v. Abu–Jamal*, 521 Pa. 188, 555 A.2d 846 (1989), *cert. denied*, 498 U.S. 881, 111 S.Ct. 215, 112 L.Ed.2d 175 (1990). In *Abu–Jamal*, we explicitly rejected the notion that a criminal defendant enjoys a right to testify at the penalty phase of a capital case without being subjected to cross-examination by the Commonwealth. *Id.* at 212, 555 A.2d at 857. Notwithstanding our resolution of that case, Appellant asks this Court to reverse itself on this point by expressly overturning the holding of *Abu–Jamal* as it relates to the issue of allocution.

Appellant takes issue with this Court's reasoning in *Abu–Jamal* for two reasons. First, he maintains that a

statutory right of allocution exists in Pennsylvania based upon Rule 1405(a) of the Pennsylvania Rules of Criminal Procedure. Second, he takes exception to the rationale employed by this Court in its explanation of how the statutory scheme of 42 Pa.C.S. § 9711 replaces allocution.

In *Abu–Jamal,* this Court addressed both of the arguments that Appellant raises today. In ultimately concluding that no right to allocution exists in a capital murder case, this Court stated:

We reject the suggestion that cross-examination of a defendant at the penalty hearing of a capital case is improper. The first flaw in the appellant's argument is that the reference to Pa.R.Crim.P. 1405(a) is clearly misplaced. The Rules of Criminal Procedure contain a separate section, Subchapter 350, providing special rules for cases in which the death sentence is authorized. Rules 352(b) and 353(b) state that "the sentencing proceedings shall be conducted *as provided by law.*" (Emphasis added.) The Comments to these Rules confirm that the law referred to is the statute adopted by the General Assembly, 42 Pa.C.S. § 9711.

This points up the second flaw in the appellant's reasoning, reliance on the right to allocution as developed at common law. Whatever force the common law of allocution has with respect to other criminal cases, the General Assembly has abrogated that law and replaced it with statutory law devised specifically for first degree murder cases. The legislature has provided that a sentencing hearing is required at which evidence may be presented to the jury, or the judge as the case may be. The court is given discretion to determine what evidence will be received as relevant and admissible on the question of the sentence to be imposed. Following the presentation of evidence, counsel are permitted to argue to the sentencing body for or against the death sentence.

It is apparent from the structure provided that evidentiary hearing is intended to serve as part of the "truth determining process" to enable the sentencer to discern and apply the facts bearing on the determination on the appro-

priate sentence. Implicit in the fact that the statute assigns to the defendant the burden of proving mitigating circumstances by a preponderance of evidence is the understanding that the jury is to assess the evidence for credibility. It must be left open for the Commonwealth to challenge the veracity of facts asserted and the credibility of the person asserting those facts, whether that person is a witness or the defendant. We find no reason in law or logic why the defendant's presentation of evidence in support of his claim that life imprisonment is the appropriate sentence should be shielded from the testing for truthfulness and reliability that is accomplished by cross-examination.

*Abu–Jamal,* 521 Pa. 188, 212–13, 555 A.2d 846, 857–58.

We find the reasoning in *Abu–Jamal* to be as persuasive today as it was seven years ago. Accordingly, we conclude that the trial court did not err when it denied Appellant's motion *in limine.*

Additionally, pursuant to 42 Pa.C.S. § 9711(h)(3), our review of the record reveals that the sentence imposed was not the product of passion, prejudice, or any other arbitrary factor. Further, the aggravating circumstance found by the jury in this case was supported by evidence in the record. The jury found that the victim was a child under the age of twelve. 42 Pa.C.S. § 9711(d)(16). Marcia, the victim in this case, was four years old when she was killed.

Lastly, the information compiled by the Administrative Office of Pennsylvania Courts indicates that the sentence imposed in this case is not disproportionate to the sentence imposed in similar cases.

Judgement of sentence affirmed.[5]

MONTEMURO, J., who was sitting by designation, did not participate in the decision of this case.

---

5. The prothonotary of the Supreme Court is directed to transmit the full and complete record in this case to the Governor. 42 Pa.C.S. § 9711(i).